## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**RICHARD RUDD,**
      **Plaintiff,**

**v.**                                                    **Case No: 5:09cv159/RH/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
      **Defendant.**
_____

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) finding that claimant Rudd was no longer disabled.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

On October 14, 1998 Mr. Rudd was found disabled under the Social Security Act as of May 14, 1997 due to schizophrenia. On February 27, 2006 Mr. Rudd's record was reviewed and he was found not disabled as of February 1, 2006. He appropriately requested a hearing before an administrative law judge (ALJ). A hearing was held on July 7, 2008 at which Mr. Rudd was represented by counsel and testified. A medical expert, a psychological expert, and a vocational expert also testified. The ALJ entered an unfavorable decision (tr. 14-27) and Mr. Rudd requested review by the Appeals Council without submitting additional evidence. The Appeals Council declined review (tr. 5-7). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that the "comparison point decision" (CPD), which is the date of the most recent favorable medical decision finding that Mr. Rudd was disabled, was December 27, 2001; that at the time of the CPD, Mr. Rudd had the medically determinable impairment of schizoaffective disorder which met Section 12.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1; that as of February 1, 2006, Mr. Rudd's disability ended and since that date he had not engaged in substantial gainful activity; that medical evidence established that he did not develop any additional impairments after the CPD through February 1, 2006; that since February 1, 2006 Mr. Rudd had not had an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; that medical improvement occurred as of February 1, 2006; that the medical improvement was related to the ability to work because, as of February 1, 2006, Mr. Rudd no

longer had an impairment or combination of impairments that medically equaled the same listings; that beginning on February 1, 2006, Mr. Rudd's impairments continued to be severe; that beginning on February 1, 2006, Mr. Rudd had the residual functional capacity to perform unskilled work that did not require more than occasional contact with the general public and supervisors at any exertional level; that he had done no past relevant work; that he was a younger individual with a high school education and able to communicate in English; and that considering his age, education, work experience and residual functional capacity, he had been able to perform a significant number of jobs in the national economy beginning on February 1, 2006; and that his disability ended on February 1, 2006 and he had not become disabled again since that date (tr. 16-26).

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence. *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)). Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed. *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400. Substantial evidence

is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations provide an eight-step (seven steps in a title XVI claim) sequential evaluation process to be followed in cessation cases to determine if a claimant's disability continues. This process is described as follows:

> First, the claimant must not be engaged in "substantial gainful activity." [Substantial gainful activity is not a factor to be considered in a Title XIV claim]. Second, it must be determined whether the claimant's severe impairment meets or equals the severity of a listed impairment. If the claimant's condition meets or equals the level of severity of a listed impairment, the claimant's disability continues. If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the third step, namely, an assessment of whether there has been medical improvement of the claimant's

condition. Fourth, if there has been medical improvement, it must be determined if that improvement is related to the ability to do work. If there has not been medical improvement, the examiner proceeds to the fifth step to determine whether any exceptions listed in 20 C.F.R. § 404.1594(d) and (e) apply. Sixth, if there has been medical improvement, it must be determined whether the claimant has a severe impairment or combination of impairments. If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the seventh step, an assessment of the claimant's residual functional capacity ["RFC"]. The assessment measures whether a claimant can perform past relevant work despite his or her impairment. If the claimant is unable to do past relevant work, the examiner proceeds to the eighth and final step of the evaluation process to determine whether, in light of his or her RFC, age, education and work experience, the claimant can perform other work.

*Whetstone v. Barnhart*, 263 F. Supp.2d 1318, 1321-23 (M.D. Ala. 2003), *citing* 20 C.F.R. § 404.1594(f)(1)-(8). In cessation cases, the "appropriate inquiry is whether the [Commissioner's] finding of improvement to the point of no disability is supported by substantial evidence." *Id.* at 1322, *quoting Chumbley v. Shalala*, Case No. 92-12VAL (RLH),1994 WL 774030, at * 3 (M.D. Ga. Nov. 22, 1994) (citations omitted). In order to find that the claimant's condition has improved, the ALJ "must compare original medical evidence [which supported a finding of disability] and new medical evidence." (Emphasis added). *Id.* at 1322, *citing Williams v. Apfel*, 73 F. Supp.2d 1325, 1337 (M.D. Fla. 1999) (*citing Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir.1984)). The burden is on the ALJ to show that there has been medical improvement; and, in order to show this, there must be evidence of medical improvement in the form of "symptoms, signs, and laboratory findings." 20 C.F.R. § 404.1594(b)(1).

## PLAINTIFF'S MEDICAL HISTORY

Mr. Rudd was born in 1971 and was twenty-six years of age when his period of disability began (tr. 114). In May, 1989, at age eighteen, he was hospitalized for major depression with suicidal ideation, dysthymia and possible emerging

personality disorder (tr. 238-56). He was hospitalized seven months later with major depression, suicidal ideation, psychotic features, anxiety and emerging personality disorder (tr. 222-37). Over time his diagnosis changed to schizophrenia (tr. 263-66, 276). On October 14, 1998 he was found disabled under the Social Security Act as of May 14, 1997. In 2000 Mr. Rudd reported that he had performed grand jury service several times and worked as a volunteer at the fire department (tr. 378, 380, 386). In August 2001 his mother complained that he was "spending his money very quickly on women" at strip clubs (tr. 345). His record was reviewed on December 27, 2001 and he was found still to be disabled under Listing 12.03 (tr. 333-41), despite evidence that his symptoms had improved significantly, to the point that his treating physician described his schizoaffective disorder as "in remission." (Tr. 16-17, 345-46, 350).

Over the next four years Mr. Rudd's condition improved, although there is a three year gap in the medical record from October 25, 2001 to November 4, 2004. On the latter date he told his psychiatrist, John Billingsley, M.D., that everything was "going pretty well" and that he and his parents had recently moved into a new house (tr. 401). He reported that he enjoyed going to the bowling alley and shooting pool (tr. 401). He saw Dr. Billingsley again in February 2005 and reported that he was still doing well with no side effects from his medication, although he did not feel sufficiently confident in his social skills to join a structured bowling league (tr. 400). During the next visit, in May 2005, he told Dr. Billingsley that he had enjoyed a recent cruise trip, which included gambling and visiting Mayan ruins (tr. 399). In December 2005 he told Dr. Billingsley that he was doing well and still enjoying pool, although there were times that he momentarily lost his train of thought (tr. 395). In February 2006, Mr. Rudd told Dr. Billingsley that he was doing "okay," but he was having

trouble distinguishing his thoughts from his speech (tr. 438). Dr. Billingsley adjusted his medication. His GAF was 50 (tr. 438).[1]

In April 2006, Mr. Rudd reported that he was doing well, despite the stress of his disability review. His GAF was 61 (tr. 437).[2] In July 2006 he again reported some anxiety over his disability review, but stated that he was doing "fairly well" overall, and Dr. Billingsley made no changes to his medications. His GAF was 64 (Tr. 436). On July 25, 2006 Dr. Billingsley wrote a letter stating that Mr. Rudd was very limited in his ability to function in many areas, could not tolerate more then minimal stress, and had difficulty relating to others. He felt that Mr. Rudd could not work a full time job (tr. 438). In October 2006 Mr. Rudd told Dr. Billingsley he was doing "pretty well," even though he was helping to care for two seriously ill grandmothers. His GAF was 66 (tr. 435).

Mr. Rudd returned in January 2007 and reported that he sometimes felt that people were watching him, even though he knew it was not true. He also complained of oversleeping. Dr. Billingsley adjusted Mr. Rudd's medications to address the oversleeping problem. His GAF was 66 (tr. 434). In June 2007, Mr. Rudd again complained of oversleeping and mentioned the possibility of working to add some purpose to his life. Dr. Billingsley encouraged Mr. Rudd to be open to opportunities for work that he might enjoy. His GAF was again 66 (tr. 467). In September 2007, Mr. Rudd was mourning the deaths of both of his grandmothers but

---

[1]The Global Assessment of Functioning Scale (GAF) was designed by psychiatrists to rate the psychological, social and occupational functioning of an individual patient on a mental health scale of 0-100. A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[2]A GAF score of 61 to 70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

stated he was dealing with the tragedies "pretty well." (Tr. 466). Dr. Billingsley adjusted Mr. Rudd's medications to help him feel more alert during the day. His GAF was 64 (tr. 434). Mr. Rudd returned the following month and reported that he was still oversleeping. Dr. Billingsley urged Mr. Rudd to increase his activity level. His GAF was 65 (tr. 434). In November 2007, he reported that he was more active during the day and that he was helping with laundry, dishes, and cooking. His GAF was 68 (tr. 464). The following month he reported that he had been going shopping and that he had visited the bowling alley and an aviation museum but was having relationship problems with his parents. His GAF was 70 (tr. 463). In March 2008 Mr. Rudd told Dr. Billingsley that he was doing "fairly well," but he was anxious about his upcoming administrative hearing. His GAF was 65 (tr. 462).

On July 2, 2008 Dr. Billingsley wrote a letter essentially restating what he had said in his July 26, 2006 letter (tr. 468).

A hearing before the ALJ scheduled for May 2008 was continued because Mr. Rudd's counsel had withdrawn from representation on the day of the hearing (tr. 568-71). Mr. Rudd appeared with counsel at the rescheduled hearing in July of 2008. Javier Barquet, M.D., an internal medicine specialist, testified as a medical expert (tr. 481-86). Based on his review of the record, Dr. Barquet opined that Mr. Rudd had no functional limitations due to physical impairments (tr. 485). Olin Hamrick, Jr., Ph.D., a clinical psychologist, testified as a psychological expert (tr. 487-523). Dr. Hamrick stated that Mr. Rudd did not meet any of the criteria of Listing 12.03, and he met only the "A" criteria of Listing 12.08, due to his continued dependence on his parents (tr. 509-13). Dr. Hamrick further testified that the record contained no evidence that Mr. Rudd's mental impairment imposed more than mild restrictions on his activities of daily living, social functioning, and concentration, persistence, and pace (tr. 510-11). Dr. Hamrick concluded that Mr. Rudd had shown marked improvement, demonstrated by the disappearance of suicidal threats and other "acting out" behavior and his progress in settling into a leisurely lifestyle (tr. 508-09, 515).

Mr. Rudd testified that he had not sought vocational rehabilitation since he was placed on disability. He stated that he was doing well on his regimen of medications, which had not been changed significantly in over two years.  However, he claimed that the medications made him drowsy, causing him to sleep over twelve hours a day. On further questioning, he admitted that an adjustment in dosage had alleviated the drowsiness problem. He was able to cook rice and pasta dishes, shop for groceries, do laundry, help with housecleaning, and walk the dog. He played pool by himself at a local bowling alley, played computer games, and enjoyed photography. He went on a cruise to Mexico and rode a bus to Mayan ruins. Recently he had gone on a trip to Georgia with his parents to visit Calloway Gardens. He enjoyed going to the movie theater and renting DVDs. He sometimes experienced anxiety when out in public, but he had learned to live with the feeling. He sometimes failed to finish projects. He believed that forgetfulness was a side effect of his medication.  He testified that he was unable to work a full-time job because it wasn't something he was used to doing, he had never been able to hold a job, and he hadn't been able to find one (tr. 527-54).

The ALJ asked the Vocational Expert, Leslie Gillespie, about a person of Mr. Rudd's age, education, language skills, and intelligence, with no physical, communicative, or environmental restrictions, the mental limitations described by Dr. Hamrick, and with the ability to handle only occasional contact with the general public, co-workers, and supervisors. The Vocational Expert testified that such an individual could perform other jobs existing in significant numbers in Florida and nationally, such as garment folder, hand packager, construction site flagger, and cook helper (tr. 560-62).

## DISCUSSION

Mr. Rudd argues that the ALJ erred in finding him to be no longer disabled because his condition continued to meet the criteria of Listing 12.03(C), and in failing to consider the effect of his medications, and that he had not medically improved and continued to be disabled.  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that Mr. Rudd was no longer disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1. Listing 12.03.

The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling.  If a claimant meets the requirements of one of the listings, no further proof of disability is required.  *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Listing 12.03 provides, in relevant part:

> 12.03    *Schizophrenic, paranoid and other psychotic disorders*: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> * * *
>
> C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or

**2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or**

**3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.**

20 C. F. R., Part 404, Subpart P, Appendix 1 (2008).

Mr. Rudd contends that he continues to be disabled because he meets the requirements of subpart 2 of listing 12.03C.  Although Dr. Hamrick testified that Mr. Rudd does not meet the 12.03C criteria because he lived at home and was able to come and go, Mr. Rudd argues that Dr. Hamrick ignored subpart 2.  That is, he said nothing to counter the contention that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[.]"

Mr. Rudd's argument does not necessarily follow based on Dr. Hamrick's testimony.  The expert's entire relevant testimony was: "Well he's lived at home within a protected environment, as far as home can be considered such.  But it's not an institution. And he comes and goes. He drives. He comes and goes as he pleases. He takes his own medication. Takes care of his own activities of daily living. So, I really can't see that that would meet the criteria for C, either."  (Tr. 510).

The ALJ held that there had been medical improvement as of February 1, 2006. He noted that Mr. Rudd took care of his own personal needs, had no emotional withdrawal or isolation, drove a car, went on trips, completed tasks he started, went bowling, played the guitar, worked on his computer, played video games and frequented strip clubs "in pursuit of female companionship." (Tr. 17).  The ALJ also noted that Mr. Rudd shopped, played pool, went bowling, rented videos, traveled to Atlanta, and that Dr. Billingsley recommended that he go to such places to meet people (tr. 18-19).  These findings support a conclusion that a minimal increase in

mental demands or change in the environment would <u>not</u> cause decompensation as required by subpart 2 of Listing 12.03C. Moreover, Dr. Hamrick was clearly referring to this subpart when he testifies that Mr. Rudd was able to drive, come and go as he pleased, and take care of his own activities of daily living. Thus, although Dr. Hamrick did not say Mr. Rudd did not meet either subpart 1 or 2 or 3, he said that Mr. Rudd did not meet the "C" criteria, which encompasses all three. The ALJ appropriately considered all the evidence, and his decision was supported by substantial record evidence. Mr. Rudd is not entitled to reversal on this ground.

      2.    <u>Medication side effects.</u>

Mr. Rudd also argues that the ALJ ignored the side effects of his medications. He shows that he told Dr. Billingsley about his excessive sleep, loss of train of thought and problems focusing. This argument is unsupported. First, Mr. Rudd never told Dr. Billingsley that he had side effects from his medication. He did complain of over-sleeping, but admitted at the hearing that adjustments in dosages had alleviated problems with drowsiness (tr. 537). The ALJ also noted that Dr. Billingsley mentioned that sleeping late was related to Mr. Rudd's staying up late to play on his computer (tr. 21, 380). The medication side effects was never directly raised, but the record supports the ALJ's implied decision that there was no real dispute on the issue. Mr. Rudd is not entitled to reversal on this ground.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 21ST day of May, 2010.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**